# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

LISA A. SCHEFFERT,

           Claimant,

vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

           Defendant.

No. 18-CV-1031-LTS

**REPORT AND RECOMMENDATION**

_____

      Plaintiff Lisa A. Scheffert ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I. BACKGROUND

      I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here. This is an appeal from a denial of disability insurance benefits ("DIB"). Claimant was born September 1, 1983. (AR[2] at 148.)

_____

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

Claimant has a BA in business administration.[3] (*Id.* at 32.) She allegedly became disabled due to neurocardiogenic syncope.[4] (*Id.* at 180.) Claimant's original alleged onset of disability date was July 30, 2015. (*Id.* at 148.) Claimant filed an application for DIB on August 4, 2015. (*Id.*) Claimant's last date insured is December 31, 2020. (*Id.* at 14.) Claimant's claim was denied originally and on reconsideration. (*Id.* at 81-84, 86-89.) A video hearing was held on September 27, 2017 with Claimant and her attorney, Corbett Luedeman in Dubuque, Iowa and ALJ Matthew Gordan and vocational expert ("VE") Jeff Johnson in West Des Moines, Iowa. (*Id.* at 29-58.) Claimant and the VE testified. (*Id.* at 32-57.) The ALJ issued an unfavorable decision on November 28, 2017. (*Id.* at 11-22.)

Claimant requested review and the Appeals Council denied review on May 29, 2018. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On August 27, 2018, Claimant timely filed her complaint in this Court. (Doc. 4.) The case was originally assigned to Chief District Court Judge Leonard T. Strand and then-Chief Magistrate Judge C.J. Williams. On September 17, 2018, when Judge Williams was appointed as United States District Court Judge, the case was reassigned to me as Magistrate Judge. On April 17, 2019, all briefing was completed and the Honorable Leonard T. Strand referred the case to me for a Report and Recommendation.

---

[3] In her application, Claimant stated that she had completed three years of college, but she completed her degree four months after she applied for benefits. (AR at 32, 148.)

[4] Neurocardiogenic syncope "occurs when you faint because your body overreacts to certain triggers, such as the sight of blood or extreme emotional distress. It may also be called [vasovagal syncope.]" Mayo Clinic, Vasovagal syncope, https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v.*

*Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted). If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is

responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

### A. *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset of disability date. (AR at 14.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: neurocardiogenic syncope, right knee degenerative joint disease, obesity, gastritis, fructose malabsorption, and generalized anxiety disorder. (*Id.*) The ALJ considered Claimant's mental impairments under listing 12.06 (anxiety and obsessive-compulsive disorders). (*Id.* at 15.) The ALJ considered the limitations imposed by Claimant's obesity not only under the listings, but also when assessing her claim at other steps of the process, including when crafting Claimant's RFC. (*Id.* at 19.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id*. at 14.)

At step four, the ALJ found that Claimant had the RFC to perform light work with the following additional restrictions:

> [S]he can push and pull as much as she can lift and carry; never climb ladders, ropes, or scaffolds; occasional exposure to extreme heat, extreme cold, and humidity; must avoid hazards such as unprotected heights and dangerous machinery; no operation of a motor vehicle to carry out job duties; limited to indoor work with ready access to a restroom; simple, routine tasks; occasional contact with supervisors, coworkers, and the public.

(*Id*. at 16.) The ALJ further found Claimant is unable to perform her past relevant work. (*Id*. at 20.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform including marker, photocopy operator, and page. (*Id*. at 21.) Therefore, the ALJ concluded Claimant was not disabled. (*Id*.)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice

simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.    DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to fully and fairly develop the record related to her physical limitations and did not provide good reasons for discounting her credibility and (B) failing to provide sufficient reasons for the weight assigned to the opinion of Laura Hoffman, LMHC. Claimant further argues the ALJ was not appointed in a constitutional manner. Thus, the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

**A.**    ***The ALJ fully and fairly developed the record regarding Claimant's physical limitations and provided good reasons for discounting Claimant's credibility.***

The "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this

7

responsibility "independent of the claimant's burden to press his case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806. However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir.1988)). The ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). Although Claimant bears the burden to "provid[e] the evidence [the Court] will use to make a finding about [Claimant's] residual functional capacity," the Court is "responsible for developing the claimant's complete medical history." 20 C.F.R. §

8

404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p.

Claimant argues that the ALJ did not fully and fairly develop the record regarding her physical RFC. Specifically, Claimant asserts that the ALJ should have obtained a treating or examining physician's opinion "concerning how [her] ability to work was impacted by her physical impairments and so the ALJ [could determine her] credibility after such necessary record development." (Doc. 13 at 8.)

Claimant's brief in this matter is a bit disjointed, perhaps due to the ALJ's tendency to cite broadly to "medical reports or records," "testimony," or "evidence as a whole," rather than to use pinpoint citations[5] to certain pages of the administrative record. (*See*

---

[5] The ALJ did provide some pinpoint cites, but not as often and not enough to make review of record particularly convenient.

AR at 18-20.)  In his resistance, the Commissioner has responded in kind.  I have tried to group Claimant's arguments somewhat in the order they are presented in her initial brief.

### 1.    Arguments Related to the Sufficiency of the Evidence

In support of his finding that the medical evidence does not support a finding of total disability, the ALJ stated that when Claimant was evaluated in May 2015 at University of Wisconsin Health for near syncopal episodes,[6] she was seeking treatment for the first time, although she reported four-to-five events a week for the previous three-to-four years.  (*Id.* at 18.)  Claimant argues that this was untrue—she had been seeking treatment before November 2014. (Doc. 13 at 5 (citing AR at 300-01 (Nov. 7, 2014 treatment note for syncope symptoms).)  Claimant is correct.  Not only does her citation confirm that she sought treatment prior to May 2015, the University of Wisconsin treatment note indicates that she had previously worn Holter and Event monitors and had electrocardiograms, all of which had returned normal results.  (AR at 340.)  However, the ALJ did not rely on the lack of treatment history prior to May 2015, alone, to support his decision, and because Claimant does not allege her disability began until July 30, 2015, lack of earlier treatment may not be dispositive in this case.

The ALJ opined that "[t]he record reflects that the claimant has some problems, but it is not clear what is causing them. But the medical evidence of record is not consistent with totally disabling limitations." (*Id.* at 19.)  In support of this conclusion, the ALJ stated, in part, "the claimant has not generally received the amount and type of medical treatment one would expect for a totally disabled individual, considering the relatively infrequent trips to the doctor for the allegedly disabling symptoms and significant gaps in the claimant's history of treatment." (*Id.*)  Claimant argues that she

---

[6] Claimant has never lost consciousness during one of her episodes.  (AR at 52.)

regularly sought treatment for her conditions during the relevant time period. (Doc. 13 at 5.) The Commissioner responds that although Claimant told healthcare providers at the University of Wisconsin in 2015 that she had been having syncope incidents for the previous three-to-four years, there is nothing in the record indicating treatment from 2011 and 2012. (Doc. 14 at 7.) The Commissioner's argument is without merit because SSA only requests medical documents dating back one-year from the alleged onset of disability date. (*See, e.g.* AR at 375 (requesting medical records for the period "7/2014 to present").)

In addition to the University of Wisconsin appointment, the parties agree that Claimant sought medical treatment for her cardiac syncope eleven times between her alleged onset of disability date of July 30, 2015 and the date of her hearing, September 7, 2017. (Doc. 12 at 3-8.) These visits were scheduled by her cardiac team and were as "regular" as medically necessary. More important than the number of visits, however, is what occurred at those visits.

Claimant asserts that although the ALJ relied on "some discrepancies in information reported by the claimant to various treating sources when addressing symptom levels, effectiveness of treatment, and capabilities of functioning" as support for his decision, the ALJ did not explain "what those discrepancies were or provide any citations to the record." (Doc. 13 at 5 (citing AR at 19).) The Commissioner responds that Claimant's quotation is taken out of context because the ALJ began the quoted passage with the words, "As noted above." (Doc. 14 at 8 (citing AR at 19).) The Commissioner notes that "above," the ALJ mentioned that while in May 2015, Claimant reported four-to-five near syncopal episodes per week for the previous three-to-four years, by September 2015, she denied experiencing any syncopal episodes. (*Id.* (citing AR at 18, 338, 360).)

While it would have been helpful if the ALJ had cited specific portions of the record throughout his decision, at this point in the decision, the ALJ was clearly referring to his previous discussion of the evidence contained in the administrative record. (AR at 19.) His reference to "above" includes not only the pages cited by the Commissioner, but also pinpoint citations to other select pages of the administrative record and citation to "forms completed in connection with [Claimant's] application and appeal, . . . medical reports or records, . . . [and] the claimant's testimony." (AR at 18.) This "arguable deficiency in opinion-writing technique had no bearing on the outcome of [the] case and does not require remand." *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (internal quotation omitted). *See also Hinds v. Saul*, No. 18-CV-3065-CJW-MAR, 2020 WL 1043448, at *4 (N.D. Iowa Mar. 4, 2020) (reasoning that when the ALJ said he considered the entire record, the court presumed he did) (citing *Wilburn v. Astrue*, 626 F.3d 999, 1003-04 (8th Cir. 2010), which applied the presumption of regularity to conclude the ALJ discharged his official duties as described)).

Claimant filed for DIB based on her neurocardiogenic syncope. The treatment notes in the record support the ALJ's decision. After Claimant had a tilt table test in May 2015 at University of Wisconsin Health, she saw Katy Wethal ARNP[7] on September 3, 2015 and reported no new syncope symptoms since staring Propranolol on the day of her tilt table test. (*Id.* at 365.) On September 16, 2015, Claimant established care with cardiologist Rami Eltibi, denied any syncopal episodes, and stated that her episodes were getting milder on Propranolol. (*Id.* at 360.) Dr. Eltibi increased Claimant's dosage of Propranolol. (*Id.* at 364.) In December 2015, Claimant told Dr. Eltibi she was feeling the same, with occasional palpitations and dizziness with activity and that she sometimes

---

[7] ARNP is an abbreviation for "advanced registered nurse practitioner." Swedish [Hospital], https://www.swedish.org/services/primary-care/types-of-providers/what-is-an-arnp.

felt like she might faint. (*Id.* at 613.) Dr. Eltibi added fludrocortisone to Claimant's medications. (*Id.* at 617.) On January 24, 2016, Claimant saw Ms. Wethal for another medical issue, but told Ms. Wethal that since starting fludrocortisone, her syncope symptoms had decreased to one-to-three episodes. (*Id.* at 661.) Claimant stated that "heat, alcohol and moving from sitting to standing" were all triggers for her syncope. (*Id.*) Two days later, Claimant saw Julie Ehlinger, ARNP at the cardiac clinic for a routine follow-up appointment and told her that she could not identify any "pattern related to food or activity" that triggered her syncopal episodes. (*Id.* at 610.) At that appointment, Claimant reported that her episodes had decreased from two-to-five-times-a-day to one-to-three-times-a-day. (*Id.*) Ms. Ehlinger increased Claimant's Propranolol, stressed the importance of hydration, and encouraged Claimant to begin an exercise program. (*Id.* at 612-13.)

Over the next 11 months, Claimant returned to the cardiac clinic four times for medication management. Ms. Ehlinger changed Claimant's medications as necessary in response to Claimant's symptoms, most notably discontinuing Propranolol and starting Claimant on Metoprolol. (*Id.* at 606.)[8]

On January 18, 2017, Claimant saw Dr. Eltibi, who noted that Claimant reported that her symptoms were less frequent and shorter in duration since starting fludrocortisone, that she denied any major syncopal or presyncopal episodes, and that in the past few months she had been able to identify factors that triggered her symptoms and tries to avoid them.[9] (*Id.* at 592.) At this appointment, Dr. Eltibi noted that Claimant could take an extra half-tablet of Metoprolol as needed for palpitations. (*Id.* at 593.) Dr.

---

[8] During this time, Claimant was also seen in the emergency room for dizziness on March 25, 2016. (AR at 500.) Claimant was treated with a liter of saline and an IV of Solu-Cortef, after which she felt "much better" and was released. (*Id.* at 503.)

[9] There is no indication in the treatment notes regarding what Claimant's triggers were.

Eltibi continued Claimant on her medications and told Claimant to avoid triggers and to keep well-hydrated.  (*Id.* at 597.)  On April 24, 2017, Claimant told her therapist, Laura Hoffman, LMHC, that she was experiencing an increase in her vasovagal episodes.  (*Id.* at 859.)  The final treatment note devoted to Claimant's neurocardiogenic syncope is dated July 18, 2017, less than two months prior to the hearing.  (*Id.* at 589.)  Claimant reported only occasional symptoms that were "a little worse with the high heat and humidity."  (*Id.*)  Claimant's heart would also race about once-a-month for fifteen minutes or less, but Claimant had not taken any extra Metoprolol for this symptom.  (*Id.*)  Ms. Ehlinger declared Claimant's neurocardiogenic syncope "adequately controlled on current medical therapy," made no changes to Claimant's medications, and encouraged physical activity as Claimant was able.  (*Id.* at 592.)  Claimant requested to see Dr. Eltibi in six months.  (*Id.*)

The ALJ was correct that Claimant reported a varying degree of symptoms during the relevant time period as she and her health care providers worked together to find the proper combination of medications to control Claimant's symptoms.  The record as a whole shows that Claimant starting experiencing significant relief after adding fludrocortisone to her medication regime.  I cannot ignore Ms. Ehlinger's comment that Claimant's neurocardiogenic syncope was adequately controlled as of July 2017.  Thus, I find Claimant's argument that the ALJ did not explain or provide citations to the parts of the record that contained discrepancies not only meritless, but also that the relevant treatment notes in the record support the ALJ's decision.

Regarding inconsistent testimony and statements, Claimant stated that "since there are no known triggers as to what causes [her] episodes, there were numerous times [she] would have to leave work or stay home from work."  (*Id.* at 193.)  Claimant also argues that the SSA recognizes that a claimant's symptoms can vary from day-to-day and that reports of different symptoms at different times does not necessarily mean those

statements are inaccurate. (Doc. 15 at 2 (citing SSR 16-3p).) However Claimant testified that she now is "getting a good handle" on when an episode is going to start so that she feels comfortable enough to drive her ten-year-old daughter to and from school every day because she can pull over if an episode starts. (AR at 44.) Claimant has never had an episode while driving. (*Id.*) In addition, although Claimant testified that computer and TV screen lights trigger her episodes, she spends two parts of each typical day watching TV and testified that even though she has a Facebook account, her computer is more "for games, and the kids," which indicates that Claimant may play computer games, something that requires her to stare at computer screens. (*Compare id.* at 35 *with id.* at 49, 194.) Claimant also testified that she gets dizzy spells two-to-four-times a day that she can last up to twenty-minutes in duration if she can lie down to let them pass. (*Id.* at 42.) This is inconsistent with Claimant's testimony that she sits to recover from dizzy spells (*Id.* at 35) and the medical evidence that documented only occasional symptoms. Claimant apparently did not seek treatment for this seemingly alarming rise in the number of episodes because she did not have any treatment notes to add to the administrative record at the beginning of the hearing. (*Id.* at 30.) The ALJ noted that "[w]hile [Claimant] continues to complain of lightheadedness, no actual syncope is documented and improvement is noted with treatment." As just discussed, the record shows marked improvement with treatment to the point where Claimant's cardiology advanced nurse practitioner characterizes Claimant's symptoms as "adequately-controlled." And, the ALJ is correct that Claimant has never lost consciousness during one of her episodes. (AR at 52.) Thus, I find that the ALJ properly relied on "forms completed in connection with [Claimant's] application and appeal, . . . medical reports or records, . . . [and] the claimant's testimony" to support his conclusion on this issue. *See Hacker*, 459 F.3d at 936 (ALJ's decision is not outside acceptable zone of choice simply because the court might have reached a different decision). Thus, I find the ALJ's conclusion that "the

claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" supported by substantial evidence on the record as a whole. (*Id.* at 17.)

Claimant next avers that the ALJ "maligned Ms. Scheffert's earnings history, stating it raised 'some questions as to whether the current unemployment is truly the result of medical problems, as she reportedly experienced presyncopal episodes for several years while working.'" (Doc. 13 at 6 (citing AR at 19).) This argument is without merit. As Claimant points out, she had consistent earnings that constituted substantial gainful activity from 2008-2015. (AR at 155.) The ALJ, however, did not "malign" these earnings. The ALJ stated that "[i]n eleven years since 2000 has the claimant [sic] made substantial gainful activity level earnings. . . . Her work history raises some questions as to whether the current unemployment is truly the result of medical problems, as she reportedly experienced the presyncopal episodes for several years while working." The ALJ merely used this strong work record, along with Claimant's statements regarding the number of episodes she had during her high earnings years (four-to-five near-syncopal episodes a week beginning as early as 2011 and going through May 2015), to make the point that even at the time when Claimant's symptoms were at their alleged worst, she was capable of substantial gainful activity. (*Id.* at 19, 338.) *See Goff v. Barnhart*, 421 F.3d 785, 792–93 (8th Cir. 2005) (when claimant worked with impairments for over three years and there was no evidence of significant deterioration in her condition, impairments were not disabling) (citing *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992)). The ALJ also noted that Claimant's ability to work fulltime while allegedly experiencing so many near-syncopal episodes a week calls into question Claimant's current reasons for applying for disability benefits when her episodes are better-controlled. In short, the ALJ merely used Claimant's prior work as evidence, as an ALJ would use any other piece of evidence in the record.

### 2. Arguments Related to how the ALJ Weighed and Discussed Work-related Restrictions

Claimant argues that the ALJ "faulted" her because none of her treating doctors recommended work restrictions. (Doc. 13 at 6 (citing AR at 19-20).) Claimant asserts that "the lack of treating opinions in the medical record concerning how Ms. Scheffert's impairments would impact her ability to work warranted a consultative examination be ordered to provide that missing treating or examining physician evidence" and that when patients are not seeking work, "many providers would not ordinarily add work restrictions in treatment notes—it does not mean the ALJ is free to assume the provider would not assess limitations if asked directly for clarification." (*Id.* (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).) Claimant further argues that the ALJ's reliance on the opinions of the state agency medical consultants is misplaced because Claimant had continued treatment at the cardiac clinic after the consultants rendered their opinions, which ultimately resulted in what she calls "reasonable control" in July 2017. (Doc. 13 at 7.) Claimant also urges the Court to treat Dr. Eltibi's January 18, 2017 treatment note that Claimant should "avoid triggering factors" as "more or less like a work restriction-like opinion." (*Id.*) Claimant asserts that the ALJ did not notice this treatment note. (*Id.*)

First, as mentioned above, there is no indication that Dr. Eltibi knew what factors were triggering Claimant's episodes in January 2017 or even if those triggers were logically related to work. Except for humidity, Claimant has been inconsistent in identifying and reporting triggers, even telling Ms. Wehl she had identified triggers one day and telling Ms. Ehlinger two days later that she could not identify any triggers. (*Id.* at 610, 661. *Compare also* AR 589 (humidity as a trigger) *with* AR 35 (car lights, some store lights, computers, and TV screens as triggers).) No triggers are mentioned in the treatment note from the appointment with Dr. Eltibi. Thus, I decline to interpret Dr.

Eltibi's treatment note as a work-related restriction. Work-related restrictions must be more specific in order to be universally understandable and enforceable. Ms. Ehlinger, the ARNP who treated Claimant most often at the cardiac clinic, never mentioned limitations of any kind and encouraged Claimant to engage in physical activity. (AR at 592, 600, 603, 606, 609, 613.) Importantly, the ALJ accounted for known triggers to heat and humidity by including a limit in the RFC to indoor work with only occasional exposure to extreme heat, extreme cold, and humidity. (*Id.* at 16.)

Claimant cites *Bowman v. Barnhart*, 310 F.3d 1080 (8th Cir. 2002) for the proposition that when a longtime treating provider's notes do not contain information concerning the claimant's ability to engage in work-related activities, "the ALJ should have developed the record as to the provider's opinions before relying on the nonexamining opinions of a state consultant." (Doc. 13 at 6 (citing *Bowman*, 330 F.3d at 1085).) The Commissioner argues that *Bowman* can be distinguished from the case at bar because

> In *Bowman*, the Eighth Circuit Court of Appeals held that the ALJ was obligated to re-contact a claimant's treating physician for additional evidence and clarification because his treatment notes were 'somewhat cursory,' merely listing the claimant's impairments and medications. *Bowman*, 310 F.3d at 1085. Here, treatment notes from plaintiff's providers at the internal medicine and cardiology clinics were not cursory. Rather, these notes contained quite detailed physical examination findings (*See, e.g.* [AR at] 363, 381, 399, 596, 616).

(Doc. 14 at 13.)

The Commissioner is correct. The relevant treatment notes are very detailed. Each examination encounter covers multiple pages. Here, there is no doubt that Claimant had achieved adequate control of her symptoms and was only experiencing occasional symptoms and knows how to stave off episodes if she feels one starting. Claimant was encouraged by her healthcare providers to engage in physical activity and to avoid things

that triggered her pre-syncopal episodes, things that she can now identify and that the ALJ incorporated into her RFC. (*Id.* at 592, 597, 600, 603, 606, 609, 613.)  *Bowman* relied on *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), also cited by Claimant. However, *Nevland* only requires remand when the record contains no medical evidence supporting the ALJ's decision, which is not the situation with the case at bar.  204 F.3d at 858.

In this case, the record contained opinions from two state agency consulting physicians.  (*Id.* at 63-65, 75-78.)  Laura Griffith, D.O., reviewed the record on November 13, 2015, and noted that Claimant continued to drive when compelled and that her condition improved with treatment.  (*Id.* at 65.)  Dr. Griffith  noted that "the exertional limitation [Claimant] reports fails to correlate with this condition and objectively no hypotension is documented.  These inconsistencies partially erode the credibility of her allegations." (*Id.*)  In relevant part, Dr. Griffith found no exertional limitations and only limited Claimant to never climbing ladders, ropes, scaffolds and to avoiding concentrated exposure to hazards such as machinery and heights.  (*Id.* at 64-65.)  On reconsideration, Jan Hunter, D.O., reviewed the record, including new evidence that had been added to the record after Dr. Griffith's initial review, and affirmed Dr. Griffith's assessment as written.  (*Id.* at 78.)

The ALJ gave these opinions substantial weight, noting that the state agency medical and psychological consultants determined that Claimant was capable of light work without significant mental accommodations.  (*Id.* at 20.)  The ALJ also stated that the opinions were "well supported with specific references to medical evidence. . . . , internally consistent[,] as well as consistent with the evidence as a whole." (*Id.*)  Although the ALJ added environmental limitations and exertional limitations limiting

Claimant to light work and easy access to a restroom[10] to the final RFC that the consulting physicians did not include, the ALJ explained, "[T]his is attributable to new evidence now in the record (including testimony) that was not available to those consultants." (*Id.*) Claimant does not take issue with the weight assigned to these opinions.[11] An ALJ may rely on a lack of physician-ordered functional restrictions when deciding if a claimant is disabled. *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003); *Tennant v. Apfel*, 224 F.3d 869, 870 (8th Cir. 2000) (per curiam).

    In addition to these opinions, the ALJ cited to treatment notes, forms Claimant completed for SSA, and Claimant's testimony. Therefore, contrary to Claimant's argument, the ALJ was not "playing doctor" when he stated, "The exertional limitation [Claimant] reports fails to correlate with this condition and objectively no hypotension is documented" and went on to note activities and inconsistencies that "eroded support for" Claimant's allegations. (Doc. 13 at 5 (quoting AR at 19).) Rather, the ALJ based his decision on all of the relevant evidence. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.") (quotation omitted). As stated above, the ALJ cited to the record. These citations include citations not only to the opinion evidence, but also citations to various treatment notes from the record. (AR at 17-20.)

_____

[10] This limitation accommodates the effects of Claimant's fructose malabsorption disorder.

[11] Although Claimant is now appealing, in part, based on her mental impairments, she did not initially apply for benefits based on mental health issues. Therefore, there are no state psychological consultant opinions in the record. Claimant's counselor, Laura Hoffman, wrote an opinion on August 16, 2017. Although Ms. Hoffman's opinion will be thoroughly addressed in Part III.B, *infra*, Claimant takes issue with the ALJ relying on there being "no restrictions from treatment providers" as a reason to deny benefits when Ms. Hoffman placed work restrictions on Claimant; albeit, not physical restrictions. (Doc. 13 at 6.) Claimant does not flesh this statement out into an argument, but does note her dissatisfaction with the ALJ's characterization of the opinion evidence in the record.

In addition to the medical evidence that supported the ALJ's decision, other evidence in the record also supports the decision. Claimant watches television every morning and every evening, despite her testimony that watching television triggers her symptoms. (*Id.* at 194.) Although Claimant states that she only drives when "absolutely necessary," she does drive her daughter to and from school every day. (*Id.* at 19, 196, 200.) She also shops once a week, in spite of saying that store lights often trigger her symptoms. (*Id.*) Claimant cooks simple meals for her family every day and spends an hour a day cleaning, doing laundry, or "picking up." (*Id.* at 17, 195.) Claimant stated there is no reason she cannot go out alone, in spite of not socializing anymore. (*Id.* at 194, 198.)

Here, the record is not ambiguous. Claimant has certain physical impairments. However, those impairments are adequately controlled with medication. *See Guilliams*, 393 F.3d at 801 (explaining that a claimant's RFC is what she can still do despite her limitations). The ALJ acknowledged that Claimant reported rather limited daily activities. However he also noted that on a daily basis, Claimant "tries to pick up[,] do laundry, reads a book, can focus on reading, goes grocery shopping on [her] own only if she needs a couple of items, cooks dinner sometimes, and does laundry. (AR at 17.)

The record is also adequate. As discussed above, two state agency consultants and Claimant's therapist gave opinions in this case. In addition, the record contains not only treatment notes from office visits, but also results from Claimant's tilt table test, summaries in treatment notes explaining that Claimant had negative Holter monitor tests, event monitor tests, and negative echocardiograms. Claimant's cardiologist and advanced registered nurse practitioner at the cardiac clinic, both of whom Claimant sees as advised for her neurocardiogenic presyncope, never assigned Claimant any limitations, and instead encouraged physical exercise and told her to avoid triggers. Claimant's past work record shows that she was able to work full time before her neurocardiogenic

presyncope was adequately controlled. The record was adequate and no further opinion was necessary. *See Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

### 3. *Argument Related to Trigger Factors and Jobs in the National Economy*

Claimant proffers the following argument related to her physical RFC and the jobs she can do in the national economy:

> At hearing, Ms. Scheffert described her "trigger factors" for her neurocardiogenic presyncope symptoms. (*See* TR 35 (explaining car lights, computer lights, TV's, store lights depending on the type, all bothered her)). She explained she could not work at her last job because the computers and stress caused her symptoms to flare. (TR 36). When her symptoms came on, she needed to sit down right away until her symptoms subsided. (TR 35). The ALJ took this information from the hearing, disregarded it, and found Ms. Scheffert could work, inter alia, a job that would clearly trigger her neurocardiogenic symptoms. (*See* TR 21 ("Photocopy operator")). The ALJ's RFC determination that led him to the conclusion that Ms. Scheffert could work as a Photocopy Operator was clearly deficient as it failed to account in any fashion for the triggering factors for Ms. Scheffert's neurocardiogenic presyncope symptoms, which if considered, would clearly have precluded work as a Photocopy Operator.

(Doc. 13 at 7.) I assume Claimant is arguing this job might involve some level of computer screen work or, perhaps, that the lights from the photocopiers will trigger Claimant's symptoms, although the VE testified that computer work that lasted more than 30 minutes at a time (Claimant's asserted limit) would not be involved with any of the jobs he recommended. (AR at 56.)

The Commissioner responds that Claimant has not challenged the ALJ's finding that she could also work as a marker or page. (Doc. 14 at 13 (citing AR at 21).) The Commissioner notes that neither of these jobs involves computer work or exposure to the type of light that allegedly triggers Claimant's symptoms. (*Id.* (citing *DOT*, 209.587-

22

034, 1991 WL 671802 (marker); 249.687-014, 1991 WL 672351).) The Commissioner further asserts that because the ALJ limited Claimant to "simple, routine tasks with only occasional contact with supervisors, coworkers, and the public," he eliminated "any potential stress that would trigger" Claimant's symptoms. (*Id.* at 13-14.)

The Commissioner is correct. Claimant does not object to the other jobs proffered by the VE. Thus, Claimant has waived any objections to the marker and page jobs because the arguments are not developed. *See Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived)); *Rotskoff v. Cooley*, 438 F.3d 852, 854–55 (8th Cir. 2006) (considering undeveloped argument "abandoned for failure to provide any reasons or arguments for his contentions") (quotation omitted).

Even if the photocopy operator job is inappropriate for Claimant due to copier light, I find that the 196,140 marker jobs plus 7119 page jobs (AR at 21) constitutes a significant number of jobs in that national economy that are appropriate for Claimant. *See Weiler*, 179 F.3d at 1111 (32,000 jobs in the national economy was a significant number of jobs). Therefore, this argument is at least without merit.

### 4. *Arguments Related to* **Polaski** *Factors*

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the

23

claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[12] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

Claimant prays for remand "so the ALJ can redetermine Ms. Scheffert's credibility after . . . necessary record development." (Doc. 13 at 8.) Claimant does not cite any of the *Polaski* factors in her brief, but only states that "[t]he general factors for evaluating credibility were set out years ago in *Polaski v. Heckler* and are still applicable." (*Id.* at 4 (citing *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017).) To the extent Claimant wished to raise a separate *Polaski* argument, that argument was not separately briefed. Reading Claimant's brief with an eye towards *Polaski*, I can discern arguments related to the following factors: (1) the duration, frequency and intensity of her episodes; (2) precipitating and aggravating factors (i.e., trigger events); (3) dosage, effectiveness and side effects of medication; and (4) the claimant's functional restrictions.

---

[12] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

As discussed above in more detail, although the ALJ cited the record rather broadly, he properly acknowledged and considered the duration, frequency, and intensity of her episodes and dosage and effectiveness of medication together when he noted some of the highs and lows of Claimant's presyncope symptoms, stated that they improved with treatment, and stated that no actual syncope was noted. (AR at 18-19.) In relevant part, the ALJ also noted precipitating and aggravating factors when he crafted Claimant's RFC to include no exposure to extreme heat or humidity. (*Id.* at 16.) The ALJ further noted functional limitations by not only limiting Claimant to no extreme heat or humidity, but also to light exertional work, to no operation of a motor vehicle, and to "simple, routine tasks with only occasional contact with supervisors, coworkers, and the public." (*Id.*) Therefore, to the extent Claimant proffers a challenge based on *Polaski*, I find that the ALJ addressed the challenged factors. *See Hacker*, 459 F.3d at 936.

### 5. *Conclusion*

After a thorough review of the record, I find that the ALJ's decision is supported by the record as a whole. Claimant worked at the level of substantial gainful activity for years during which she told her healthcare professionals she was experiencing presyncope episodes at a rate of four–to–five a week, rather than the occasional episodes documented in the medical record. Even though Claimant testified that she now experiences episodes daily, she also feels capable of managing them well enough that she can drive to her daughter's school twice a day and pull over if need be. Claimant's treatment regimen works without Claimant even resorting to her backup Metoprolol for palpitations. Although, as the ALJ noted, the record does not contain evidence of robust activities of daily living, Claimant does engage in activities that call into question her credibility such as driving to the grocery store when compelled; watching television; and shopping every week. In addition, neither Dr. Eltibi nor Ms. Ehlinger assigned Claimant any functional

restrictions.[13]  In fact, Claimant was encouraged to engage in physical exercise.  There is no contrary medical evidence that makes the record ambiguous or requires a consulting medical opinion.  The record is quite clear that Claimant's symptoms are now under adequate control.  The ALJ crafted an RFC that acknowledges Claimant's impairments and limitations.  Therefore, under the deferential standard of review, the ALJ's decision on this issue should be affirmed.

**B.**     ***The ALJ provided sufficient reasons for the weight assigned to the opinion of Laura Hoffman, LMHC.[14]***

Ms. Hoffman is Claimant's counselor.  On August 16, 2017, Ms. Hoffman completed a Mental Medical Source Statement that contained check-box and fill-in-the-blank questions.  (*Id.* at 832-40.)  Ms. Hoffman said she began treating Claimant in fall 2015 and continued to treat her through the date she wrote her statement.[15]  (*Id.* at 832.) Ms. Hoffman stated that Claimant had clinical findings of mild to moderate mental impairment due to stress, anxiety, feelings of embarrassment, and a realistic fear of fainting.  (*Id.* at 833.)  She stated that Claimant's prognosis was "fair due to moderate to severe limitations in physical activity and heat intolerance to not trigger vasovagal episode."  (*Id.*)

Ms. Hoffman stated that Claimant suffered from an anxiety disorder and checked "yes" on the question asking if Claimant relied upon "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) on an ongoing basis to

_____

[13] Claimant seems to argue that physicians only assign functional restrictions when they know claimants are working.  However, physicians often assign non-workplace functional restrictions that easily translate into work-related functional restrictions such as walking, sitting, and standing restrictions.

[14] LMHC is an abbreviation for licensed mental health counselor.

[15] The first treatment notes in the record from Ms. Hoffman are dated February 17, 2016.  (AR at 844-45, 850-56.)

diminish the symptoms and signs" of her mental disorder.  (*Id.* at 834.)  However, Ms. Hoffman did not say which of the listed supports Claimant relied upon to diminish the symptoms of her anxiety.  (*Id.*)

In addition, Ms. Hoffman said, "Yes" when asked if Claimant experienced "[a]ny episodes of deterioration which have resulted in absence from school, work, or which have otherwise made it difficult for [Claimant] to sustain age-appropriate activity over time.  (*Id.* at 835.)  Ms. Hoffman wrote in, "Unable to work."  (*Id.*)  Ms. Hoffman also checked off that Claimant had the following "signs and symptoms:" appetite disturbance with change in weight; panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; detachment from social relationships; preoccupation with orderliness and perfection; feelings of inadequacy; and impaired executive functioning, e.g. difficulties with decision making, planning, or attending to tasks, which reflects a significant cognitive decline from a prior level of functioning.  (*Id.* at 836.)

When asked to rate Claimant on various mental abilities and aptitudes related to work-related abilities, Ms. Hoffman rated most of Claimant's abilities as either unlimited or good or limited but satisfactory.  However, she rated Claimant's abilities to maintain regular attendance and be punctual within customary, usually strict tolerances and to deal with normal work stress as seriously impaired.  (*Id.* at 837-38.)  She further opined that Claimant would be unable to meet competitive standards in the areas of making work-related decisions, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors.  (*Id.* at 838.)  Ms. Hoffman explained that Claimant "would have moderate to severe difficulty in maintaining appropriate attendance without significant accommodations/breaks [illegible] high

anxiety. Under stress, it is felt that she would not be able to receive constructive criticism or cope with [illegible] stress." (*Id.*)

Ms. Hoffman also filled in a check box related to Claimant's functional limitations. (*Id.* at 839.) Ms. Hoffman opined that Claimant had marked restrictions in daily living; in understanding, remembering, or applying information; and in concentrating, persisting, or maintain pace. (*Id.*) She further opined that Claimant would miss more than four days of work a month and would be off-task 25% of each work day. (*Id.* at 838.)

The ALJ gave Ms. Hoffman's opinion little weight because he found it was "not consistent with Ms. Hoffman's treatment notes and the medical evidence of record." (*Id.* at 20.)

### 1. *Legal Standard*

Because the Court does not know the level of Ms. Hoffman's education and training, under SSA regulations, she is either a "medical source[] who [is] not [an] 'acceptable medical source[]' or a 'non-medical source.'" SSR 06-03p, 2006 WL 2329939, at *2. This distinction makes no practical difference because the analysis of her opinion is the same regardless of her classification. Medical sources who are not acceptable medical sources are considered "other sources" *Id.*

Although the five factors enumerated in 20 C.F.R. 404.1527 and 416.927 apply exclusively to the evaluation of medical opinions from "acceptable medical sources," the same factors *can* be applied to opinions of "other sources." *Id.* at *4 (emphasis added). These factors include the following:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id.* at ** 4-5. Furthermore, "In determining what weight to give 'other medical [source] evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Peterson v. Colvin*, No. C14-4110-LTS, 2016 WL 1611480, at *6 (N.D. Iowa Apr. 21, 2016) (quoting *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).

> An ALJ is required to consider other sources, but may discount these sources if such evidence is inconsistent with the evidence in the record. *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006); *Raney*, 396 F.3d at 1010). The ALJ is required to explain the "weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p.

*Id.*; *see also Gulick v. Colvin*, No. C13-4038-MWB, 2014 WL 197727, at *11 (N.D. Iowa Jan. 17, 2014), *R. & R. adopted*, 2014 WL 941730 (N.D. Iowa Mar. 11, 2014) (quoting SSR 06-3p). Therefore, the Court must determine if the opinion is consistent with other evidence in the record and whether the ALJ's decision allows the Court to follow his reasoning.

### 2.    *Analysis*

#### a.    *Length and Frequency of Treatment Relationship*

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). As described above, Ms. Hoffman stated she

has been treating Claimant since 2015. Although she states that she has seen her every three–to–four weeks during that time at both Hillcrest Family Services and Crossroads, the administrative record contains only five treatment notes and one discharge note. (AR at 843-61.) The December 1, 2106 discharge note states that Claimant had not been seen at Hillcrest since May 11, 2016. (*Id.* at 847.) While there is scant documentation of the treatment relationship, no one challenges that Ms. Hoffman is Claimant's counselor. The few treatment notes in the record document a treatment relationship beginning February 17, 2016, with additional appointments on January 11, April 24, July 19, and August 24, 2017. (*Id.* at 850, 857.) Therefore, this factor weighs in favor of giving the 2017 opinion more than little weight.

### b. *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying

more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quotation omitted).

Although Ms. Hoffman answered "Yes" when asked if Claimant experienced "[a]ny episodes of deterioration which have resulted in absence from school, work, or which have otherwise made it difficult for [Claimant] to sustain age-appropriate activity over time (*Id.* at 835), her treatment notes contain no documentation of deterioration or of Ms. Hoffman missing any events due to mental health symptoms. In July 2017, Claimant and Ms. Hoffman did explore Claimant's "anguish" over Claimant's inability to be outdoors and be more active in the humid weather with her children, but that is not a documented deterioration due to mental health symptoms. (*Id.* at 858.) Rather, that is a response to how situations affected her health. Ms. Hoffman did not describe a deterioration in Claimant's mental health in her treatment notes, and Claimant apparently found a way to cope with the situation by August because it was not mentioned the following month.

Ms. Hoffman also stated that Claimant had the following mental health issues: panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; preoccupation with orderliness and perfection; and impaired executive functioning. (*Id.* at 836.) However, none of Ms. Hoffman's treatment notes state that Claimant ever had a panic attack. While Claimant's mood was often anxious during her appointments with Ms. Hoffman, Ms. Hoffman never stated Claimant had or was having a panic attack, Claimant never stated that she had a panic attack, and there is no indication that Ms. Hoffman counseled Claimant on strategies or coping skills to deal with panic attacks. All of this indicates that panic attacks were not a subject Claimant

31

discussed with Ms. Hoffman, even in the event there are treatment notes missing from the record.

Likewise, the treatment notes do not indicate that Claimant has impaired executive functioning. To the contrary, at one point, Ms. Hoffman commended Claimant for having her daughters attend therapy (AR at 859) and Ms. Hoffman described Claimant's insight, judgment, and memory as intact and thought process as logical at every appointment. (*Id.* at 844-45, 857-60.) Similarly, there is no documentation for Ms. Hoffman's opinion that Claimant has a preoccupation with orderliness or perfection. Ms. Hoffman and Claimant never discussed anything related to these issues.

Ms. Hoffman rated Claimant's abilities to maintain regular attendance and be punctual within customary, usually strict tolerances and to deal with normal work stress as seriously impaired and opined that Claimant would be unable to meet competitive standards in the areas of making work-related decisions, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors. (Id. at 837-38.) She further opined that Claimant would miss more than four days of work a month and would be off-task 25% of each work day. However, there is no indication that Claimant was ever late for an appointment, that she and Claimant ever discussed Claimant needing to rest during the day, or that she and Claimant discussed the effect criticism had on Claimant. The only comment in the treatment notes that comes close to mirroring workplace criticism is Ms. Hoffman stating that Claimant "was redirectable with self doubt and negative self talk." (Id. at 859.) To the extent this note addresses workplace criticism, it supports the conclusion that Claimant is able to take constructive criticism. The treatment notes indicate that Claimant was scheduled for appointments every month, but missed appointments in March, April, May, and June 2017. To the

32

extent Claimant wants to argue that these missed appointments support Ms. Hoffman's opinion that Claimant is unable to maintain regular attendance, I do not agree because Ms. Hoffman never mentioned the treatment gaps being attributed to Claimant's symptoms. Rather, without an explanation in Ms. Hoffman's treatment notes, the gaps indicate that Claimant was not following Ms. Hoffman's treatment advice. *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("failure to follow prescribed medical treatment without good cause is a basis for denying benefits") (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001) (failure to attend weekly counseling part of basis for denial of benefits).

Ms. Hoffman opined that Claimant had marked restrictions in understanding, remembering, or applying information and in concentrating, persisting, or maintain pace. However, again, there is no indication in the treatment notes that Claimant had issues in any of these areas. Claimant' attention/concentration, insight, judgment, and memory were always rated intact. Her impulse control was always deemed adequate and her thought process was always logical. (*Id*. at 457-60.)

Ms. Hoffman opined that Claimant had marked restrictions in daily living. While Ms. Hoffman's treatment notes indicate that Claimant limited social interactions due to a fear of fainting (*Id*. at 857), the rest of Claimant's issues can best be labeled "situational stressors." When Claimant first saw Ms. Hoffman in February 2016, Claimant's mental health examination results were all within normal limits. (*Id*. at 844-45.) The only "clinically significant finding" added to the check-box form mental status exam was a note stating Claimant had vasovagal syncope. (*Id*. at 845.) When Claimant returned to therapy in January 2017, she had a depressed mood and appropriate affect. (*Id*. at 860.) As indicated above, all other parts of her mental status exam were within normal limits. Claimant was experiencing "significant financial distress" and was hoping to learn healthy parenting skills to employ with her ex-husband. (*Id*.) In April 2017, her mood

was anxious, her affect was appropriate, and all other parts of her mental status examination were still within normal limits. (*Id.* at 859.) Claimant was having "parental stressors" and stress over an increase in her vasovagal episodes. (*Id.*) In July 2017, Claimant had "anxiety and distress regarding recent humid weather" and her inability to be outside with her children and anxiety over providing support for a brother with mental health issues. (*Id.* at 858.) Ms. Hoffman stated that Claimant's progress was stagnant. (*Id.*) However, on August 24, 2017, Claimant's prognosis was fair even though she was dealing with increased anxiety and depression over her upcoming Social Security hearing and sadness over losing her home to foreclosure. (*Id.* at 857.) The stressors Claimant was reacting to were situational and changeable. Situational stressors cannot provide the basis for a disability finding. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo*, 241 F.3d at 1040.

Based on the inconsistencies between Ms. Hoffman's treatment notes and her opinion, this factor weighs against giving the opinion more than little weight.

### c.     *Consistency*

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).     The ALJ noted that Claimant received "minimal mental health treatment, with a diagnosis of generalized anxiety disorder for which she is prescribed medication (Lexapro)." (AR at 19.)[16] The ALJ also noted gaps in Claimant's treatment history and some discrepancies in the information Claimant provided to her treatment providers. (*Id.*)

---

[16] Claimant's general practitioner also added Wellbutrin to Claimant's daily medication regimen and Alprazolam as needed for episodic anxiety, although Claimant rarely uses it. (*Id.* at 638.)

As discussed above, in spite of Ms. Hoffman stating that she has treated Claimant every three–to–four weeks since 2015, the actual treatment record does not support this statement. In addition, during the same period for which we have records from Ms. Hoffman, Claimant's mental status was "Alert, Oriented, Cooperative, No short term memory loss, Good concentration, Does not appear depressed, Does not appear irritable" on May 17, 2017 when she saw a nurse practitioner at her primary care clinic. (*Id.* at 637. At other medical appointments during this time, Claimant was consistently alert and oriented to person, place, and time. (*E.g., id.* at 630, 639, 648.) She was also alert and oriented, cooperative, with normal judgment, appropriate mood and affect, and had no cognitive impairment during her appointments with Ms. Ehlinger and Dr. Eltibi. (*E.g., id.* at 360-63, 589-617.) In March 2016, Claimant told Kathy Wethal, ARNP, at her primary care clinic that her anxiety had improved on her then-increased dose of Lexapro and she was increasing her activities of daily living. (*Id.* at 656.) On June 5, 2017, Claimant told her primary care provider that moving in with her mother had alleviated some of her stress. (*Id.* at 629.)

In addition, Claimant was alert, oriented, cooperative, did not appear depressed or irritable, and had good concentration and no short-term memory loss during a May 2017 sleep study. (*Id.* at 637.) In June 2017, Claimant told Ms. Wethal that she felt "her mood [was] doing well" on her then-current medications and that her daytime fatigue symptoms had improved since she starting taking her Lexapro in the evening instead of the morning. (*Id.* at 629.)

Claimant argues the following:

The ALJ did not provide any explanation as to what was present in Ms. Hoffman's treatment notes or the medical evidence of record that led him to conclude all of her limitation opinions were not worth further discussion. The ALJ failed to provide sufficient reasons for disregarding Ms. Hoffman's opinions. The ALJ's error was not harmless. Ms. Scheffert had

35

a fear of feinting [sic] in public places that was an important part of her claim. (TR . . . 44, 204, 850, 857).

(Doc. 13 at 9.)

The pages of the record cited by Claimant do not support her argument. Page 44 is Claimant's hearing testimony that she does not like crowds because she has a fear of passing out in front of strangers. When Claimant's attorney asked her if she was worried about passing out while driving her daughter to school, Claimant testified, "It's always a fear in the back of my head, but I feel like I'm getting a good handle on it that I know when to pull over." (AR at 44.) Claimant further testified that she has never had to do so. This indicates that although Claimant understandably fears having a fainting episode, she "has a handle" on when one is coming, and would be able to sit down (*see id.* at 42) for a few minutes until the episode passes. On page 204, Claimant updated her application for benefits sometime in late 2015. Claimant described a medication change Dr. Eltibi made in fall 2015 and stated that the change was not providing her relief, but was causing more symptoms: "numbness in my fingers and twitching and rolling of my eyes which make [sic] me fear that I will soon begin fainting." (*Id.* at 204.) Claimant also stated that she was going to see Dr. Eltibi in December 2015. (*Id.*) This citation is unhelpful for two reasons. First, Claimant did see Dr. Eltibi in December 2015 and he added fludrocortisone to Claimant's medications. (*Id.* at 617.) After that, Dr. Eltibi and Ms. Ehlinger worked with Claimant on medication management until July 18, 2017 when Claimant achieved adequate control of her symptoms. (*Id.* at 592.) Second, although Claimant told Dr. Eltibi at that December 2015 appointment that she "continues to feel the same" and that she had "occasional palpitations and dizziness with activity and sometimes [felt] she might pass out," she did not mention numbness in her fingers or eye rolling to Dr. Eltibi, which calls into question the veracity of her statement to SSA on page 204 of the administrative record. (*See* AR at 613.)

Pages 850 and 857 are treatment notes from Ms. Hoffman in which she noted Claimant's fear of fainting in public or in social settings. As previously discussed, Claimant's neurocardiogenic presyncope is now adequately controlled and Claimant testified that she had a good enough handle on the condition to feel comfortable driving with her child in the car. Thus, while Claimant may always have some fear of fainting, she seems to be confident in her ability to know when she needs to sit down (or pull over) to let an episode pass. Moreover, although Claimant testified that strangers and not knowing people are stressors that would make it hard for her to have even a simple sit-down job (*Id.* at 45), the RFC limits Claimant to only occasional contact with supervisors, coworkers and the public. (*Id.* at 16.)

Finally, Claimant argues that her "condition, which required her to give up many activities, would reasonably cause her a great amount of anxiety should she attempt to work, and the impact of that anxiety would reasonably lead to the serious limitations Ms. Hoffmann listed when she provided opinions concerning Ms. Scheffert's mental limitations." (Doc. 15 at 3.) This argument is speculative. Claimant stated in her adult function report that she finishes what she starts, follows written and spoken instructions very well, gets along with supervisors very well, and, as long as she is not having an episode, can pay attention "as long as needed." (*Id.* at 216-17.) Thus, as the ALJ stated, Claimant's "forms completed in connection with the application" are consistent with the RFC, rather than with Claimant's alleged impairments. (*Id.* at 18.) Furthermore, Claimant did not allege anxiety in her application for benefits. *See Dunahoo*, 241 F.3d at 1039-40 ("The fact that [the claimant] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed.") (citing *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir. 1993)); *Riniker v. Berryhill*, No. 16-CV-1035-KEM, 2018 WL 1558276, at *5 (N.D. Iowa Mar. 30, 2018), *aff'd sub nom. Riniker v. Comm'r, Soc. Sec. Admin.*, 764 F. App'x 563 (8th Cir. 2019) (same). The

first record of Claimant seeking mental health medication is January 13, 2016 and mental health counseling is February 17, 2016. (*Id.* at 788 (first mention of Lexapro prescription); 843-46, 850-56 (first counseling appointment)). Therefore, this factor does not weigh in favor of giving the opinion more than little weight.

### d. Specialization

"[G]enerally [the ALJ will give] more weight to the opinion of a specialist about issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Although Ms. Hoffman is a licensed mental health counselor, the record contains no information about her training or level of education. Therefore, this factor weighs only slightly in favor of giving the opinion more than little weight.

### e. Conclusion

After a thorough review of the entire record, I find that the ALJ's opinion regarding Ms. Hoffman's opinion is supported by substantial evidence on the record as a whole and should not be disturbed. Although Claimant is understandably nervous about fainting in public, she also testified that she knows when episodes are coming, her cardiology team has declared that her presyncope symptoms are adequately controlled, and it appears Claimant did not begin mental health medication management until January 13, 2016 and did not seek counseling until February 17, 2016 (*Id.* at 788, 843-46, 850-56.) Even now, she only receives conservative treatment, receiving her medication from her primary care advanced registered nurse practitioner and seeing her counselor intermittently. A conservative course of treatment can weigh against a claim of disabling impairment. *See Milam v. Colvin*, 794 F.3d 978, 984 (8th Cir. 2015). I recommend that under the deferential standard of review, the ALJ's decision on this issue be affirmed.

**C.    Claimant failed to timely raise her Appointments Clause argument under *Lucia v. SEC*.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049.    Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*.  (Doc. 13 at 9-23.) Claimant asserts this Court should vacate the denial of benefits by ALJ Gordon and remand the case for decision by what she contends is a properly-appointed ALJ.  (*Id.* at 9.)  Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court.  (*Id.* at 10, 15.)

Claimant asserts that her case can be distinguished from many of the earliest cases addressing this issue because the earlier cases were decided before EM-18003 was issued by the SSA and before former Acting Commissioner Berryhill's authority lapsed, which "led the SSA to lack a Department Head that could provide a remedy for an Appointments Clause challenge."  (*Id.* at 9.)  For support, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council.  (Doc. 15 at 4.)  However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level.  2019 WL 1202036, at *9583; *see also Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896, at *7 (N.D. Iowa April 10, 2019) (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court), *appeal docketed*, *sub nom Murphy v. Saul*, No. 19-2202 (8th Cir. June 12, 2019).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), *affirmed*, *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, –– F.3d ––, 2020

WL 370832 (3d Cir. Jan. 23, 2020). (Doc. 13 at 10.)[17] The *Bizarre* court held that it did "not believe that [the claimant] was required to raise her [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." *Id.* at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003)).

Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addressed the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, –– F.3d ––, 2020 WL 370832 (3d Cir. Jan. 23, 2020), and provided additional reasons why *Murphy* is still the better view. No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950 (M.D. Fla. Jan. 28, 2020), the district court determined that the claimant's Appointments Clause challenge failed because the claimant waived the issue by not raising it before the ALJ or Appeals Council. *See id.* at *8. Further, the district court stated that "[t]he Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJs are so subject." *Id.* The district court points out that, "[a]t the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. . . . In contrast, there are currently over 1,700

---

[17] Claimant also cited the Report and Recommendation in *Fortin v. Comm'r of Social Security*, No. 18-cv-10187, 2019 WL 421071 at **1-4 (E.D. Mich. Feb. 1, 2019), *R. & R. adopted in part and rejected in part by* 372 F. Supp. 3d 558, *appeal docketed*, No. 19-1581 (6th Cir. May 24, 2019). The part of the R. & R. that was rejected was the recommendation that the case be remanded for rehearing before a properly-appointed ALJ. 372 F. Supp. 3d at 568.

Social Security Administration ALJs." *Id.* The district court also notes that "[t]he Social Security Administration annually receives about 2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings." *Id.* The district court concluded that "[i]f courts were to apply *Lucia* to Social Security cases as Plaintiff argues this [c]ourt should, millions of cases would need [to] be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

> The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at \*3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).
>
> In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id*. In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.
>
> Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at \*\*5–6 (paragraph break added).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 13 at 11), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal. In addition, Claimant's argument that former Acting Commissioner Berryhill's authority lapsed between November 2017 and April 2018, leaving the SSA with "no Department Head . . . with the power to appoint an inferior officer to hear her claim or otherwise decide her claim" much of the time it was pending (*Id*. at 15), is unavailing for the same reason.

Nothing prevented Claimant from raising this issue in her appeal to the Appeals Council and preserving it for appeal to this Court.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 5th day of March, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa